We have three cases on today's docket scheduled for oral argument. The first is cause number 16-50643, United States of America v. Richard Martinez. Is the appellant ready to proceed? Yes, Your Honor. Pelley? Yes, Your Honor. All right. You may proceed. Good morning, Your Honors. My name is David Curry, and together with Mr. Simons, I represent the appellant, Richard Martinez. Mr. Martinez is a United States citizen who was charged with possession with intent to distribute methamphetamine and conspiracy to do the same. After a two-day jury trial in which Mr. Martinez was not permitted to testify in his own defense, something I'll come back to in a moment, he was acquitted of the conspiracy charge, but he was convicted of the possession charge. Despite having no criminal history, Mr. Martinez received a nearly 20-year sentence, 235 months. The sole factor that determined this first-time offender's extremely lengthy sentence were clear mathematical miscalculations concerning the quantity of methamphetamine that he was held responsible for, and I want to get right to that issue first. It's important to point out initially that the government made a conscious decision in this case not to put in any evidence at trial concerning the quantities of methamphetamine for sentencing purposes. The government only put in, and they were very clear about this to the district court, they were only going to put in what they needed to prove the conviction. To get the conviction, the government only had to show that there was a liquid solution in Mr. Martinez's gas tank that collectively weighed over 500 grams and that contained some detectable amount of methamphetamine. The government did not have to show anything about the actual amount of pure methamphetamine, and it didn't have to show that the mixture was in any way usable in the form in which Mr. Martinez possessed it. Now, as your honors know, for sentencing purposes, drug quantity calculations work very differently to be held accountable for an amount of a controlled substance at sentencing. You either use the amount of pure controlled substance, or you can use a mixture containing a detectable amount, but you have to show that the mixture is usable in the form in which the defendant possessed it. Now, as I mentioned, the government was very clear with the district court that it was not... What's the definition of usable? Well, so that's reflected in the sentencing guidelines, but basically it has to be something that can be used in the form in which it's intended to be used or marketed when the defendant possesses it. Of course, the district court did not use usability. They didn't go the usability route. They went the pure controlled substance route. And because the government both only put in evidence at trial concerning drug quantities for conviction purposes, but then at sentencing didn't put in any additional evidence, they relied entirely on that trial record they had made. The evidence concerning pure methamphetamine quantities was extremely threadbare. I think everyone's agreed on that. So what was actually in the record? The testimony on this issue came from Catherine Surma, who's a city of Austin Police Department chemist. She testified that the liquid solution, and I really want to focus on the liquid solution because that is what drove Mr. Martinez through the stratosphere of the drug tables. The liquid solution contained a liquid that she could not identify in any way, and it contained some amount of methamphetamine. She gave us two other pieces of information, and those are in her report, which is tab eight of your record excerpts. It's record pages 136 and 137. Let me ask you a practical question. How could you conceivably get that much quantity out of that much liquid unless you find some of it included in the liquid? And that's an awful lot. Agreed, Your Honor. I don't know how many kilos it was, but how many kilos is it said to have? So they said Mr. Martinez had 22.30 kilograms of pure methamphetamine. To give Your Honor some context— I have a pretty good idea what that is, and that just seems on its face to be flat wrong. Agreed, Your Honor. And when the government had their street value expert up, they didn't use a 22-kilogram figure. I'm sure they didn't. That's obviously wrong. So what—the sentence is based on what number? So the sentence is based on two numbers. Principally, it's the 22-kilogram number because that drove— What do you mean principally? It either is or doesn't, doesn't it? Well, the 22-kilogram number was sufficient to get Mr. Martinez to the highest offense level he could possibly get. Right, yeah, well, okay. I mean, it's the most—it's beyond the top of the drug tables. Now, if we cut out that 22-kilogram figure, we are left with some amount of a solid substance. And we have arguments in our brief about why the calculations with respect to the solid substance also were logically and mathematically flawed. But even if you did include all of that, and even if you included all of that as pure methamphetamine, Mr. Martinez would have only been at level 34, and that would have been a sentencing range of between 151 to 188 months. He got 235. Now, if you took the solid substance as a mixture containing a detectable amount of methamphetamine, he would have been at offense level 80, and he would have gotten between 97 and 121, or 121 months. That would have been his range. Of course, what happened in this case was the probation officer combined the two numbers that were included in Ms. Serm's report, and the record makes clear that those two numbers could not be combined in the way she did. Specifically, the two numbers in her report were the weight of the solution and the concentration of methamphetamine. As we've explained in our brief, a concentration is the amount of something dissolved per unit of volume. And those definitions that we've cited have gone completely unrebutted. So you cannot use a weight and a concentration to derive the amount of the substance in the solution. That's just basic middle school chemistry, basic mathematics. So the error was clear in this case. Middle school chemistry? High school. Oh, all right. Some middle schools, maybe. I want to turn to Mr. Martinez's challenge to his conviction. There's no question under Rock v. Arkansas that a defendant has a constitutional right to testify in his own defense. The question in this case is whether that right exists when the district court refused to reopen the evidence to permit Mr. Martinez to testify in his own defense. It's undisputed that the answer to that question is provided in Judge Garwood's opinion in United States v. Walker. The facts of Walker very closely parallel the facts of this case. I want to focus in on the two factors and the two areas where the government has tried to create some daylight between this case and Walker. The first has to do with the third Walker factor, which is the effect of granting the motion to reopen. And the government is essentially claiming prejudice that they claim was not present in the Walker case. Well, that turned those three witnesses. And they turned those three witnesses? That's the government's argument. Argument? I understand they argued that, but they did. Is that disputed? No, I don't think it's disputed that the government released its rebuttal witnesses 75 minutes earlier. So just to sort of set the table on this. What's your best case where it's undisputed that government witnesses were released? But government witnesses are released and a circuit court reverses a trial court's decision not to reopen. Can you think of one? So the closest case I have on that would be Walker's discussion of Larson. Walker's discussion of Larson? Yes, Your Honor. So if you look at page 1180 of Judge Garwood's Walker opinion, this is where he discusses, well, the fact that although the government had already put on its rebuttal witnesses in Walker by the time the defendant wanted to reopen the evidence, that the government basically said they weren't going to put on rebuttal if Walker testified. And they said, okay, so there's no prejudice to the government in this case. And then they said, just like in Larson, they wrote specifically, Your Honor, again, this fact parallels the situation in Larson in which the court stated that, quote, so far as it could ascertain from the record, the prosecution would have no difficulty in assembling its witnesses in rebuttal to the newly offered testimony. In Larson, there was no question that when the defense moved to reopen, the government's rebuttal witnesses were not in the courtroom, but they were in the metro area. And the court in Larson found that that did not create prejudice because there's nothing to suggest that the government couldn't obtain these witnesses to come testify in rebuttal to the defendant's testimony. And that is the passage, that is the section of Larson that Walker cites when it says, just like in Larson, there's no prejudice to the government here. I think it's also important to note that the government here, when first asked by the district judge, what's your view, said this guy's yanking the system around. That's correct. And in looking at the Walker factors and the effect prong, are we allowed to look at the whole record as to whether or not this defendant was jerking the system around? Well, I – Would that be something we would be able to look at? I don't think you would look after the motion to reopen was denied. No, before. Whatever he'd done in front of the district court. Look, I think that, yes. The reason, if you say yes, I looked at the detention hearing, and sort of remarkably that this defendant is told by the district court, you lied to me, it's as clear as your nose and your face, your word means nothing to me. So that caused concern to me that this defendant was very much gaming the system at various points. Well, I . . . Remember that's when he said, well, the marshals wouldn't let me get a phone call out, and then there was a hearing on it and the marshals came in and the defendant admitted, okay, that was a big lie. And the district court makes that finding. Yes. Is that relevant to this man sort of jerking the system around? You know, the concern would be here, he gets to hear the Rule 29 discussion, and the rule going forward, the problem would be defendant hears the court say, you know, I'm going to deny it because just it's close, but on this issue. And then the defense says, well, now I want to testify. I can address that issue. So just to make sure I understand what you're saying, do you think the fact that Walker heard his – sorry, Martinez heard the court deny the motion for acquittal is . . . I'm saying fourth factor, no explanation ever. We have to come up with some rule that doesn't allow a defendant to just say, well, now I've heard the court's concern, I can address that. I want to win that Rule 29 motion. Reopen, I testify, now I'll win. We can't have a rule that just allows him to change his mind based on what he hears at Rule 29. So here you've got no explanation ever given. I guess I'll be here and let me turn that into a question. What's his explanation now? His explanation is that he changed his mind. Okay, but that can't be the rule you're asking us to institute, is it? Walker was a fellow who had taken the stand against the advice of his lawyer. You were seeking to reopen and testify against the advice of his lawyer? Yeah, I think that may be suggested in the Walker case. I mean I think it's suggested in this case as well maybe. I think . . . Well, the exchange between the trial judge here and Sparks at the time was Judge Sparks, to me rightfully, asked the counsel, is this, basically, do you want to do this? And he said, basically, I've advised him not to do this. And he said, the last thing Judge Sparks said was, and it's certainly not in his interest to get back on that witness stand. I'd rather think that was awfully good advice. Now, I don't know how you formulate that in it. This is not somebody trying to exclude someone or taking someone away from them. The reality is, in the real world, is they were protecting the guy from himself, and now he's going to flip it back. So that's the difficulty. Let me respond to this before I come back to your point, Judge. Thank you. I'm running a little short on time. Answer his first. The thrust is the same. Judge Higginbotham, what I'd say to you about that is, you have an absolute right to represent yourself at trial. Of course. And everyone in this courtroom knows that's a horrible idea, and you're going to lose if you do it. But if that right is infringed, you get a new trial. There is no harmless error review whatsoever. And I would say the right to testify. You do not have an absolute right to dial in and dial out in exercising that right. Unquestionably, you're not going to trial without a lawyer. You can't force him to say he can't defend himself. We do have a whole procedure and process for doing that. The very elaborate procedures that attend that process reflect considered judgment. You can't just dial in and dial out. Well, agreed. But there is an abuse of discretion standard, and we do have the Walker case which explains those factors and reverses on facts essentially analogous to this. I just want to get to your question, Judge Higginbotham. Go ahead and ask his. He'll give you extra time to answer a question. But on the fourth factor, and that's the one that I find the most compelling, is him offering, and you've already been asked that question, but the only reason he offers for his motion to reopen so that he could testify is that he changed his mind? Yes. How could that be the rule we could write? That can't be the rule. They could gain the system every time. No, I don't agree with that. I want to get to the answer that I've got for you on this, which is when Walker talks about that issue, they are talking about, is he trying to gain the system? Is there evidence of unfair advantage? I mean, the Walker court was very unimpressed with Walker's excuse in that case, but they found there's no unfair advantage here, even though the government's rebuttal witnesses had already testified. In some of the cases cited by the government, where the defendant has moved to reopen, like, at closing arguments or at a much later stage, those courts have focused on the lack of a reason, and that makes sense, because if you move to reopen after closing arguments, there's some sort of basic – it suggests that you are trying to gain the system. Rule 29 arguments give you a great insight. It's the same situation, just move it ahead a little bit, right? If the court says, and they often do, this is a really close case, here's why I think there's just enough. You wouldn't allow – you wouldn't want defendants to be able to say, well, now I've changed my mind. I can answer that just enough. You're going to have to forgive a little bit of my ignorance here. The Rule 29 conference, you mean when the defense moved for – government presents its case, defendant moves to Rule 29, defendant rests, no evidence, moves again. This defendant heard both those moments. But there's – I mean, there's no substantive discussion in this record about – That would be the rule. You don't have to give an explanation if there's no substantive discussion. I mean, I think you're looking to whether he's obtaining an unfair advantage. Okay. I mean, look, it's a four-factor test. It's – True, but last – Can I ask one last question? Wouldn't the first – what's the first circuit decision, Byrd that they're citing? Peterson. Peterson, and then the 11th is – Byrd. Yeah. They put a heavy amount of emphasis on the fourth factor, don't they? Well, they do, and it's for the reason I explained, where there's – Yeah, okay. In Byrd, it's much later. In Peterson, I mean, it was like the court said the guy was trying to throw his trial. Yeah. So you just don't have those factors that suggest that this is some kind of nefarious attempt to game the system here. Okay. And so the excuse prong is much less important per Walker's original analysis. Thank you. All right. Thank you, Counsel. Thank you. You may proceed. May it please the Court. My name is Jennifer Friel, and I represent the United States. After the close of evidence, the defendant's right to testify is subject to the discretion of the trial court. The close of evidence is that bright line. Before the close of evidence, the right to testify is unassailable. But if a defendant waits until after the close of evidence, then it is within the trial court's discretion. And in the instant case, Mr. Martinez waited. He gave no proffer, no explanation for what he wanted to testify about. And as has already been pointed out, he gave no excuse. And his own attorney said, I have advised him that it would be bad to testify. But throughout this man's procedure, starting from the initial appearance, he and his attorney were clashing, special hearings about whether to appoint new counsel. And in that initial appearance in front of the magistrate, he says four or five times, I have no prior record. I got this card at an auction. I didn't know, didn't know. So he has this single narrative that he keeps interrupting people to assert. And he has no prior record. And then you have Walker that says, you know, when a defendant wants to testify, that's different. Reopen for little or sundry things. That's a pain in the neck. It takes time. But the defendant's own words should be given a priority. Well, this case is distinguishable from Walker in many ways. And I also want to get to your first part of your question about what he wanted to tell the court. But with regard to Walker, I think it's important to note that in defendant's opening argument, defense counsel said Mr. Walker is going to testify. While evidence was still open, Walker said, I really want to testify. I'm just not ready. I'm just emotionally not ready. It was in the record that he wanted to but just emotionally couldn't get over the hump to get on the stand. And his attorney, and I remember this because it stands out, said, Your Honor, I was caught with my pants down. I didn't think the government was going to finish this early. So there's all this in the record before the evidence even closes. And then after the close of evidence, Walker gives an excuse. He says, I wasn't emotionally ready and I wasn't, and this stands out, I wasn't documentarily ready. I had not gone over all the documents that I needed to go over in time to testify. That is a very clear excuse. And here we have nothing. What happened on the record in connection with his decision to testify or not? And I'm talking about before the close of evidence. Mr. Martinez? Yes. He was given the government rested. They had the Rule 29 motion. Then do you have any witnesses? Of course the jury is still out. And Judge Barks gave a 20-minute recess for counsel because he'd known there was some strife here to talk to him. And certainly the record shows he didn't ask for more time. And then, as often happens, defense counsel came and said, The defense rests. We aren't calling any witnesses. So there's nothing on the record, like in Walker, where there was this sort of anger. But you're talking about his being emotionally incapable of getting. That's on the record? You know, no, not for Martinez. There's nothing on the record about his emotion with regard to testifying. From the initial appearance, there are these outbursts, and he, against counsel's advice, often. Initial appearance? Are you referring to a proceeding or his initial appearance at the hearing? Oh, I'm sorry. Proceeding, day one in front of the court. All right. Go ahead. And then also had several attorney status hearings. And he repeatedly sort of put this narrative out there that I just drove this truck, which presumes that someone else left $5 million worth of methamphetamine in a truck that they sold, which is reasonable to infer would not be the best defense, especially when you have receipts. That may be why the lawyer told him it's not wise to get back on the witness stand, because you can't explain why they're going to trust you with $5 million. And he had the receipts, Your Honor, I agree, showing he had bought a fuel pump, he had bought fuel system cleaner. But, you know, if we just rigorously apply Garwood's framework, the government concedes this was very timely. This is just within two hours. It was timely. And it is, under Walker, it's self-apparent. A defendant's going to get on a case like this. It's obvious. Everyone knows what he's going to say. I didn't know the drugs were in the car. Right. So then we're looking at the two final factors. And when I looked at what Judge Sparks said, he doesn't really articulate either. He first says, well, we've had the charge conference, and that wouldn't be a basis alone, right? Correct. And then he says, the jury heard the evidence is over. Well, that would always be true. Correct. So the only other reason he gives to me would be one that would be reversible error, which is he says, I don't think this would help him. But neither a defense attorney nor a court can tell a defendant, you can't testify because we've decided it doesn't help you, correct? Certainly. So if a district judge had said, I'm going to deny your motion to testify, reopen and testify, because I think it will hurt you, that would be reversible error. I'm asking that question. What's your answer on that? Could I just ask her a question first? Yes, but you're misstating the facts. I don't think I am. Let's see if the government says I'm wrong. Let me get her answer. Go ahead. So the facts played out in a different way, Your Honor. Okay. And the court has the discretion. And there's nothing in any of these cases that says the court has to go through each factor and make a determination as to each factor. Did I describe the three factors he went through? The four. That he went through. Sorry. That Judge Sparks went through. Did I describe the three he went through? It's a very quick little hint. Did I describe the three factors? He said first, charge conference over. He said second, jury heard evidence is over. And the only other thing I remember him saying in connection with his ruling is this wouldn't benefit you. Am I wrong? He did ask counsel for counsel's opinion. And the government also got onto the record the fact that the witnesses had been released. But he'd already sustained the objection before the government says that. He never reiterates that as a reason. Instead, what he says is this wouldn't benefit you. Right? He never says, oh, I find prejudice or effect. But certainly a trial judge with this amount of experience, given his discretion and certainly understanding that the government would release witnesses at the close of evidence. We have to infer that from what the judge said. Quote me anything he said that goes to effect. To the excuse? No, to effect, prejudice. Prejudice. On the government? Yeah. Did the judge? The judge did not. Okay. But it's in the record from the prosecutors. And certainly any trial judge would know that at the close of evidence, rebuttal witnesses are released. I mean, I think that that is very fair to reasonably infer a trial judge would know the rebuttal witnesses are released. Let me ask the same question and state the actual exchange, the sequence of the exchanges. My point, I don't quarrel with the framing of the question. That's a very good question. However, what happens is that the court turned first to the defense counsel before he made any comment about it's not in your good interest to do this. And they asked him, can you state for the record that you're not advising him to testify? Defense, well, I'll state for the record that I advised him that why it would not be a good idea to testify in full detail, but that was his decision. What says the government? He goes on forward. He says, well, you know at this point the government said I'll jack, I mean this man's jacking the system around. Well, I'll sustain it. I'm not going to reopen the case and so on and so forth. The last comment made by the court was, well, there's no question in my mind, he's already ruled that in my mind it would not be beneficial for Martinez to testify. So all he's doing is ratifying. He's not basing it on that. He just said, well, I have the same view at all. He has already said earlier that, well, I'll sustain. I'm not going to reopen the case. That's correct. So this comment comes later. It's more of an aside, Your Honor. It's a small point, but. I agree. And the excuse, I think, is particularly important here because as the court noted in Byrd, the Eleventh Circuit said it could not foresee how a district court could abuse its discretion by refusing to reopen the evidence to allow a defendant to testify where the defendant has given no valid reason for not testifying at the proper time. And there's nothing in this record, and it is so different from Walker when there is quite a bit of discussion about the excuse. And with regard to Judge Barksley. My concern here is not the particulars, although I appreciate that sequence. My concern here is that defense counsel often understandably want to protect their client from massive impeachment. That had been an issue in this case earlier on. Certainly. And judges may similarly think, oh, don't do yourself in. But I'm trying to confirm that the government agrees that if either of those institutional actors, defense counsel or the court, refuses to allow someone to testify on that basis alone, that would be reversible error. You know, I think black and white, I could imagine a situation where a defendant was saying, here's what I want to say. Here's my explanation. Here's the character of what I want to say. Here's my excuse. And then a district court saying, well, you're wrong. I think you do a bad job. That would be different. But here we don't have even a proffer. We don't have even an excuse. Well, the answer to your question has to be that it can't, it can't, absolutely that would not be sufficient if he has any right at all. Because the right he has is to make the decision himself. Exactly. So no question about that. Exactly. And he does have the right to make that decision. And he never did make a proffer. And I think it's important when we're looking at the trial court and its immense discretion here, that just the recent unpublished case of the Melendez Jimenez case. What's the case that says immense? Why isn't it just discretion? What's the case that says you have immense discretion? That's my own. That's a big jump, though. Abuse of discretion. Right. So they have discretion. They do have discretion. And yet in Walker we highlighted that be very careful with discretion when it's the defendant saying immediately after, I want that jury to hear my story. Certainly. I began this talk by saying before the close of evidence, it's unassailable. I don't want this court to think in any way that the government wants to prohibit defendants from exercising their rights. So, please, if anything. And what's unusual about this case is then in the middle of closing, the guy interjects again. And he says, why can't I talk? I've got no criminal record. It is interesting. But given when you look at the detention hearing, when you look at this was Mr. Martinez. He interjected. This was his style. He actually got in front of the jury the fact that he didn't have a criminal record. That's true. So I think it was strategic. And while I don't like the term yanking the system around, that's very colloquial, he certainly was obfuscating. He certainly was delaying. And let's not forget that he did admit to being a mule. He did say, they used me as a mule in a previous proceeding, which the prosecutor didn't use in this case in chief, arguably out of a nicety for defense counsel. So this was someone who frequently made outbursts, but not always to his own benefit. And certainly I'm not sure this, I think some of this was lost upon his counsel, but in this type of charge, possession with intent to distribute, the government didn't have to prove that he knew what particular drug or particular amount. We only had to prove. I dare you to say if you were writing this decision, no abuse of discretion in spite of Walker because fourth factor is particularly salient or? The fourth factor is particularly salient. I also think the fact that he did the character of the evidence. Character of the evidence, the fact that he gave no proffer at trial. And I think that's where this impeachment comes in. When you're looking at character of the evidence, that's pretty broad term. And then also the fact that the government had released its rebuttal witnesses. And even though it was just an hour and 21 minutes, there was a Rule 29 conference. And in the Peterson case, it was only a half hour. A half hour. And they affirmed not reopening. Yes, Your Honor. I'm sorry. I want one fact. Get one fact very, very clear. In Walker, there was no suggestion that any witnesses had been released. As I understand it. It was certainly not as clear here. And there's this idea that our witnesses are on a leash. We can just pull them back in. But these weren't federal officers. They were locals. They were on duty. They were spread across the county. How does that help? That's prejudiced. If they're government officials, you can get them back fast. Cell phone. If they're on duty, they need to get someone to replace them on duty. If they're on a stakeout, they might even not. They're on a stakeout. You can imagine scenarios. It's reasonable to infer that they're working. They're getting paid by the taxpayers. What Judge Carwood also said is and emphasized, there was no suggestion in the record that the government let any potential rebuttal witnesses go. Yes. That's Judge Carwood. And here we did. He thought it significant. Certainly. Certainly. So I do think, you know, if I were writing the opinion, I would certainly say there was no abuse of discretion. That the line in wait does not support justice, fairness, and order. That fourth factor offering no excuse. The prejudice to the government. And the fact that no proffer had been given. Just Martinez cannot get over those facts. He cannot get over those facts. Does the record show anything about the particular witnesses that were let go? Other than they were let go. It does not. But this was a short trial. I mean, it was a day and then 14 pages of transcript testimony on the second day. So certainly, unlike Walker, Walker had cooperators. It had witnesses who were given immunity. It had documents to go over. This was a traffic stop. I don't think there was a lot that came up at trial that wasn't in the discovery packet. So to the extent we're comparing Walker and Martinez, they're very different types of cases. And Martinez's complaint was filed three months before. He had all night to consider the very, very vast majority of testimony. And he had 20 minutes with his counsel. Never gave an excuse why he waited. What happens in these? He's still free to bring up in 2255 that he clashed with an attorney and an attorney wouldn't let him testify because he had impeachment. He can always make that argument. I'm anticipating a 2255, Judge Higginson. Yes, Your Honor. You know, I think that's a trial court. Judge Higginbotham's been trial court, district court judge. You're constantly thinking, I want this trial to go well, but how do we guard against a 2255? And we could be litigating this in a new forum, for sure. I would like to turn briefly in my brief. Letting witnesses go is an important phenomenon at the courthouse in the trial world, and even in the state court practice. If I issue a subpoena for witnesses, once they come in, I can't let them go. Right. They belong to the court, in a sense. And so it's their health, everybody's benefit. And that same phenomenon occurs with the federal side, too. And the shortness, what happens normally is called pulling the string, when the other side suddenly sends up rest. Whoa, way to harm my witnesses. And then what happens frequently is that the people that pull the string let their witnesses go. They think they're their witnesses. They're not their witnesses. They're everybody's witnesses. Certainly. And the seasoned trial lawyers will always ask permission if an out-of-towner is here. Permission to release the witness. Once the evidence is closed and so forth, then that practice, I'm really a culture in which the trials operate, then no one turns a head. The government could not have excused those witnesses and put them out until it was clear that the defendant wasn't going to use them. That's a small point, but that's the culture and environment of the trial itself. Correct, Your Honor. With my remaining time, I would like to talk briefly about the sentencing issues. And here, plain error review is a correct and appropriate standard because it is so well established that a party must raise a claim of error with the district court in such a manner so that the district court may correct itself and thus obviate the need for review. And what we have here is no discussion about volume versus weight. The first time we hear about volume is in the appellant's opening brief. The district court was never told. The probation officer was never told. The prosecutor was never told, hey, why are you talking about volume? And a simple calling the chemist to the stand for three questions, did you use weight or volume? I used weight. When you said concentration at testimony, did you mean concentration or purity? I meant purity. The problem with that argument is the sheer quantity of it. I couldn't put that much of the drug in the back of my old pickup truck. I mean, it holds a lot of junk. But that's a large quantity. It is a large quantity, but it is in the lab report. I understand that. And the chemist, he was a certified. We're talking about the plainness of error and the consequences of this error are extreme. This man's serving years more than he would otherwise because of a sheer mathematical calculation that's palpable on his face. At least I think it is. The chemist who was the sworn expert admitted at trial, her lab report used those numbers. And they did. The photographs from trial, there are these buckets full of liquids that they took from that altered gas tank. Well, he's not charged with buckets of liquid. What's he charged with possessing? He's charged with methamphetamine. Yes. And what you sentenced him on the basis of was 20-something kilos of methamphetamine. That's a huge amount of methamphetamine, half an ounce of a street-sized cell. Your Honor, it is a lot of methamphetamine. And how many years did that cost him? Almost 20. Oh, just 20 years is the math. We shouldn't correct that? Your Honor, the record isn't established that there was any error. I have some sympathy with your argument on excusing witnesses, but this one's a little tough for me. Well, you know, part of it, one reason it's tough is because it's on plain error, because it wasn't preserved and we don't have that great of a record. We admit that in our brief. There's not much on the record here because it wasn't put in front of the district court. So we have a lab report. And at trial, there was not a challenge on this idea that he had $5 million worth of methamphetamine in his tank. That was not challenged at trial, the value, which goes directly with the quantity. And certainly he didn't worry about that because if he had been allowed to testify, he would have been acquitted. Well, Your Honor, his seasoned counsel didn't challenge the expert report, didn't try to get it, didn't do any of that during the trial. But to the extent the record is lacking, it's because we're on plain error review and this was not preserved, it was not in front of the district court to get a better record. Thank you, counsel. Rebuttal. Thank you, Your Honors. It was preserved. And the way we know it was preserved is if you look at the pre-sentencing report, the probation officer specifically noted the defendant himself actually made pro se objections, objecting to the notion that there was supposedly such a high amount of methamphetamine. He knew it was not correct. And if you look in the pre-sentence report, the probation officer looked at those objections and specifically noted them in the pre-sentence report. When he said there was no way something like that many kilos could have been, that to me is just self-evident. Absolutely, Your Honor. It is self-evident. And if you look at the amount, the notion that somehow you're going to get 22 kilograms of methamphetamine out of someone's gas tank is laughable. And if you look at the government really hasn't done anything to suggest why these numbers were correct. The numbers are in the report. But the reality is the numbers in the expert report are not what was used to create the sentence. The numbers that were used to find this 22 kilograms were a calculation done by the probation officer, which is obviously mathematically incorrect. There is no possible way with the numbers that were in the expert report that you could come up with the way. Could you get half that amount in a gas tank? Your Honor, if you look, you know, it's very difficult to tell. I think exactly what you could have. But one thing that gives you sort of a reality check on this is if you look at some of the Well, if you're telling me that's impossible, then you've got to have some idea what would be possible, don't you? So when we look at what typically happens in these sort of situations, the volume of the solution to the actual methamphetamine tends to be maybe 100 to 1 or 1,000 to 1. So here we have a situation where the government's claiming it's 2 to 1. Half of the solution is pure methamphetamine. That is impossible. I don't believe it's ridiculous. And just thinking about what typically happens, you can see that these numbers don't make any sense. But when you look at What was the vehicle? It was a truck. I don't remember what kind of truck. Your Honor, I don't remember the precise model of the truck. It was an older model, I think either a Ford or a where we conclude on appeal that a trial expert exhibit is plainly and obviously an error when the defense counsel didn't get it excluded, the government put it in, the district court had it in front of them. How do we possibly say Let me finish my question. Give me a case where a trial exhibit, expert exhibit, identifies an amount, and then on appeal, the court of appeals says that's plain error as to drug amount. So, Your Honor, I don't have a case precisely like that. I don't think this is that case. So this is a case where we had an expert who rendered a report. The probation officer then took that report and made additional calculations. The expert never made calculations that are inconsistent with what the expert said maybe could have been done with those numbers at trial, and came up with a number all on his own. So what's your best plain error case? So the cases that we have cited talk about the fact that when you have a mathematical error, that you cannot take a mathematical error and simply use that as the basis for a sentence. And in those situations, that is different than a plain error situation, and you cannot take a mathematical error and simply use that as the basis for a sentence. And you know that happened. But, Your Honor, the error came with a misinterpretation of the trial testimony itself. That is correct, and of the expert report. It was in the PSR, and that's what was not. So when we talk about plain error or not, we're talking about the failure to object to something that's in the PSR. Now that, to me, is plain and obvious. When you look at it, there's a disconnect. Now the question is really the fourth prong of plain error is whether or not this rises to that level that impugns the system itself. And so what we're saying is it impugned the system itself when someone served 20 years in prison for an error of this magnitude. I think it does impugn the system, Your Honor. We're not asking for a change in the system. We're simply saying if we see that it's obvious, justice has not been done. And if a little bit of care had been taken and this mathematical error had been corrected because the defendant here did object and the officer, the probation officer noted the fact that the objection was made, but they never corrected it. And this sort of goes with the whole what we've been talking about with respect to the other issues in this case. The defendant in this case was constantly pointing out the errors and the problems and the issues with this case and trying to get his story out, and he was never allowed to do that for a variety of reasons. A very short trial. It's understandable why someone in this situation would be going back and forth trying to figure out, I've never been in the justice system before. I'm trying to understand the situation. My attorney's telling me not to testify. I believe that I have evidence that will prevent me from going to jail for a very, very long time. He's wrestling with these issues. The case finishes early, and he's trying to get his attorney to let him testify so he can tell his story. There are lots of things that happen in this case. Let me clarify one other factual circumstance. When we talk about the obviousness of this, you're talking about a gas tank that would hold all those kilos of the drug, if not the amphetamine, plus they already have gallons of liquid in there with it. So you displace a good bit of whatever the holding power of that tank is by the liquid, and then you're going to put the 20-something kilos on top of that. So I guess you could have a truck that's got that large a tank, but. . . This was a normal pickup truck. It wasn't a truck with an excessively large size gas tank. The amount of material that they siphoned out. . . We know that. It didn't have an excessively large gas tank, and we know that it didn't have two gas tanks. That's correct. The only evidence is. . . You know there are a lot of pickup trucks that have two gas tanks. You know that. That is correct. I know that's possible. There's no evidence in this case that that was the case. There was one gas tank. There was evidence that it was tampered with, and that's part of the reason why they. . . We know it was not an empty gas tank. This evidence came out with six buckets. I don't know if they're gallon buckets or two-gallon buckets of liquid. So we know it was not put in. . . Whatever this was, all those kilos were put in there with six gallons of liquid. Absolutely. We know it wasn't empty because the truck was driving when the stop was made, so there was gas in the tank, and there's evidence that the expert says that she siphoned this out and then tried to remove the gasoline to the extent that she could from this solution. So we know there was gas in the tank. There's only evidence of one. But it does sound like there are two tanks. There's no evidence here of two tanks, and the government hasn't made any claim that there was, and there's nothing. . . You mean that would burn as fuel? So the evidence is that the way this is supposed to work, and I confess I don't have much experience with this. . . With pickup trucks or man? It's a different. . . Well, with either one. All right. I grew up in Canada. I know a lot about pickup trucks. Go ahead. But the way this works is the gas and the other solution are a different weight, so the gas will rise to the top and the other solution will be on the bottom, so you can actually. . . If you make a situation where you can actually siphon the gas from the top of the tank, then it will run and the solution will go to the bottom. Maybe not high school chemistry. Maybe that's college chemistry. Thank you, counsel. Your time has expired. Thank you very much.